Good morning. May it please the court. My name is Robin Conrad, and I represent the plaintiff appellants in this matter. The district court erred in ending this litigation without a trial, despite the existence of unresolved questions of fact. Because this is a summary judgment case, the court must view the evidence in the light most favorable to the plaintiffs. The evidence uncovered during discovery reveals a record of maladministration of the defendant's lethal injection protocol that presents a risk of unconstitutional harm. This court should remand this case for a trial to resolve these material questions of fact. The district court erred for three reasons. It applied the incorrect legal standard. It overlooked genuine issues of material fact. And it failed to consider evidence of a feasible and readily available alternative. I will address each of these issues in turn. Ginsburg Let me just ask a preliminary question. You argue that the district court committed error in following the Bayes' plurality substantial risk of serious harm standard. Every circuit court to have considered a lethal injection challenge since Bayes has adopted that same plurality standard. Why are all of those courts wrong? Well, Your Honor, the issue that we have presented here, that this court should follow the Marks rule and not apply Chief Justice Roberts' plurality standard, was not squarely presented in those other circuits. And this circuit already has a standard for deciding lethal injection protocol challenges under Cooper v. Remmer, which is the unnecessary risk standard. In Marks v. United States, the United States Supreme Court instructed that where no rationale enjoys a majority, then the holding of the court is simply the position taken by those members who concurred in the judgment on the narrowest grounds. In Bayes, only three justices concurred or agreed with Justice Roberts' plurality decision. Three other justices would have imposed a different standard, and two other justices would have imposed a different standard. So there were three. Can the Supreme Court just this fall restate in a death penalty case the Bayes standard in looking at whether or not there should have been a stay of an execution in Arizona? I'm sorry. Can you repeat that question? Yes. I mean, haven't the Supreme Court as late as this fall repeated that Bayes is the standard and that, as stated by Judge Nelson, that that's the standard we're to follow? Are you referring to the Landrigan case, Your Honor? Yes. Yes. The Supreme Court, in its brief order denying the stay, did cite to the Bayes plurality, quoted it. However, that is a stay. That was requesting a stay of execution. And that is not an issue here. But in citing it, it cited the standard, and it's not a stay standard. It's a benchmark standard, is it not? Well, the quote from Landrigan was whether there is a sure or very likely risk, and it didn't cite the substantial risk standard. We would argue that Justice Stevens' opinion is the one that where, which concurred in the judgment in the narrowest grounds. In applying Marx and applying this circuit's interpretation of Marx, this holding affects the narrowest range of cases. If this Court does choose to apply the Bayes standard, the district court below still erred in applying the Bayes plurality. The district court erred by conflating the test that Roberts proposed for granting a prisoner a stay to litigate his claim when deciding defendant's motion for summary judgment. Where a stay was not at issue. The district court here, at page 28 of its opinion, determined that to obtain summary judgment, defendants only had to demonstrate that Arizona's written protocol is similar to Kentucky's protocol. This misapplies the Bayes plurality. So even assuming that Chief Justice Roberts' plurality opinion does control, his opinion recognized that extensive hearings occurred in Kentucky, but ultimately determined that after those hearings, petitioners could not demonstrate on that evidence that there would be a substantial risk of pain from maladministration. Here, the district court simply looked at the revised written protocol and found it was substantially similar to Kentucky's. The changes made to the written protocol, however, do not erase the record of maladministration that was uncovered during discovery. So let's go to the record of maladministration as you've characterized it. What, in your view, is the most significant deficiency that you think the evidence supports? Deficiency in the record? No, in the protocol. Well, you have to have record evidence as to why the existing protocol on the timing and the use of the drug was inappropriate. If I may explain, Your Honor, it's not simply that we look at the written protocol now, and that's what the district court did and which was in error, because as required in a summary judgment case, the facts must be viewed in a light most favorable to the non-moving party. Here, the district court did not do that, because it simply ---- That's what I'm trying to get to. Right now, up to this point, you've basically given me platitudes. Okay. I'm saying tell me what the evidence is that you think with respect to the administration under the protocol would be in violation of the Constitution. Okay. There are three main issues of genuine issues of material fact from below. It's a disputed fact whether defendants can retain and competently screen a medical team, and that was a problem that was uncovered in the record during the discovery proceedings. The record demonstrates that assurances were made that defendants conducted background checks, including license review and criminal record review, before retaining people for the execution medical team, but the defendants nevertheless hired two people, a doctor and a nurse, who were unqualified for the medical team. So it was like member number three was identified. Is that right? Correct. Medical team member number three and Dr. Deerhoff, who is the dyslexic doctor, who was banned from overseeing executions in Missouri. Defendants agreed during this litigation not to use two of those three individuals that were just named as a result of this litigation, and when summary judgment was granted by the district court, there was only one medical team member on the medical team. At the summary judgment stage, the evidence viewed in favor of the plaintiffs demonstrates that the defendants are not able to competently retain and screen medical team members. On this record, defendants had the burden to demonstrate that they will conduct license and background checks when selecting future medical team members, and had the obligation to show they will not retain individuals with serious disqualifying medical or psychological conditions. Defendants' own expert testified that the medical team should be properly screened for their psychological stability, and even stated a known drug abuser would be unsuitable for the medical team. The district court viewed this evidence, this record of maladministration, as favorable to the defendants by ignoring this record and instead assuming the facts presented by the defendants to be true, namely that the Department of Corrections will ensure a qualified team is in place for any scheduled execution. Another disputed fact is whether defendants will be able to properly follow their written protocol. Again, in viewing the light most favorable to the plaintiffs, the critical errors that were uncovered during the execution of Robert Comer in May of 2007 give rise to questions of whether defendants will follow their written protocol. The doctor who was hired to oversee and conduct the Comer execution had never even seen the protocol, and he, in his deposition, said that. Records also indicate that the first and second drug were injected during the same minute. That causes concern whether the prisoner is properly anesthetized. And another thing that happened at the Comer execution was after the sodium thiopental was administered, the person in charge instructed the team to move forward to inject the second drug before the saline flush occurred. This mistake is problematic because the mixture of the two drugs together can clog the IV line. This problematic record related to disputed facts as to whether defendants will be able to properly follow the written protocol give rise to a question of fact. And it is also disputed fact whether the defendant's lack of any procedure for amending their protocol will give rise to unconstitutional risks. The record here demonstrates that defendants have made problematic changes to the protocol or failed to make important changes when necessary. They have amended the protocol. I'm sorry? They have amended the protocol, though. Yes. And as your argument is what? That they're they don't have a lack of procedure. There's no way that no procedure for amending the protocol. So during discovery. They did amend the protocol. Correct. So what do you mean there's no procedure? There's no procedure as to how it happened. So during discovery, the general counsel for the Department of Corrections testified that at any time she could go and make changes, delete things without any oversight. And so what happened, we learned, with a prior protocol, that there used to be a false line where one line would be hooked up to the prisoner and another line would go into a dump bucket so that the person pushing the syringe didn't know if they were pushing the syringe that went into the prisoner or that went into the dump bucket. During this procedure where the protocol would just be changed without any oversight, one of the backup lines was backup sets of drugs was removed. So the protocol had this still this false line, which then the special operations team leader said that he wouldn't know whether he was injecting drugs into the false line or the line that went to the prisoner if he was using the backup set. So there was only one backup set. So that would result in the prisoner not getting a full dose if the drugs are being split. Does that make sense? Not really. It's a factually confusing issue. And they actually amended the protocol to get rid of this false line. Right. But what this shows is an example of how their protocol and the lack of amendment procedures is a problem, because if anybody can amend it at any time, that can cause risks of an unconstitutional risk to the prisoner. Let me get this straight. So up to the point an execution might take place, just prior to that there will be a protocol in place. And you're saying that you're talking about an amendment on the fly as the execution is proceeding? Or are you talking about an amendment that would occur before the execution proceeded? Based on the record, these amendments occurred before the execution. So these were written changes that were made to the protocol. But I'm so then I'm having trouble understanding the claim, because prior to the execution, if there is a fixed protocol, and even if it had been changed from a prior protocol, then the individual would have an opportunity to challenge that, would they not? You mean the prisoner? Yeah. Perhaps. But this will, if it. Yes. Is the answer yes? I mean, I would hope you don't want to give that away. I mean, if you have protocol A today, and right before the execution they institute a different protocol, and it has changes that you don't think are constitutional, I would think the prisoner would file an emergency writ at that stage. I guess, yes, the prisoner could do that, yes. But whether the, I guess your question. Are you asking for, like, 20 days' notice? I'm trying to understand what the legal question is. And I, perhaps, that this is going beyond the scope of this, the set of facts in this case. Well, that's what I'm concerned about, because it doesn't seem that, I mean, I thought that the primary issues here, and you had six problems, if you will, that you laid out. So I'm just trying to understand this lack of procedure question, and I'm not sure it really is in this case. Well, it's a question of fact. And this came up in the record that the general counsel testified that she could at any time would delete provisions, change provisions of the protocol that may cause a risk of harm. And that was a question of fact that we believe. What's the question of fact? Whether the changes, the fact that they can amend the protocol without any procedure in place gives rise to a concern of unconstitutional risks. I might want to go for one of your stronger arguments. Okay. Well, as I stated, there are three main issues of material fact. And the most important is whether the defendants can retain and competently screen a medical team. The second is whether they will actually be able to follow the written protocol and whether the lack of amendment procedures give rise to unconstitutional risks. The final point I want to make is that the district court erred in not allowing plaintiffs a trial to prove that a one-drug protocol would be a feasible and readily available alternative. The courts basically said that, you know, there are other alternatives. There even are other alternatives, of course, to the drugs. But I thought it was pretty clear that in order for something to be constitutional, you don't simply have to be able to offer an alternative. Correct. So let's say you're right that there is an alternative. Then are you suggesting that the court would say because there's another alternative you should go with that alternative? Well, and I guess it depends on what standard this court decides to adopt for this circuit. And if it were the base plurality opinion, then the plaintiffs would have to show that there's a substantial risk of harm that could be avoided by a readily available alternative. And so in this posture, the district court should not have granted summary judgment where there are material issues of fact as to whether the defendant's protocol and practices will give rise to an unconstitutional risk, whether that's an unnecessary risk or a substantial risk. And then isn't the real question not whether there's an alternative or a better alternative, as I understand the law, simply has to be that the one chosen cannot produce a substantial risk of harm. And as long as the one chosen, even though you might say one drug versus three drugs would be better, as long as the three drugs does not propose a substantial risk of harm, it's constitutional. Well, and I would agree that under the Bayes' reading of the Bayes' plurality, you have to first show that there is a substantial risk of harm. If there's no substantial risk of harm, then the alternative does not matter. Here, though, there are genuine issues of material fact as to whether Arizona's protocol will create a substantial risk. If we agree with you, we would never get to that argument about the alternative. Is that right? You wouldn't have to, because you would remand it to the district court for a trial, and at that time, we would present evidence of the readily available alternative. I'd like to save the rest of my time for rebuttal, please. Good morning. Good morning. May it please the Court. My name is Jeff Sick. I'm an assistant attorney general in the Arizona Attorney General's Office, and I represent Appalese in this matter. The district court did not err in finding no material issues of fact of dispute in this matter. The Arizona protocol that was drafted as a part of this litigation, or during this litigation, is a protocol that is both humane and safe, and ensures that an inmate will be properly anesthetized prior to the administration of the two additional drugs to the first drug, sodium thiopental. The- May I just say, the link, at least, is that you provided your brief to the amended protocol didn't work for us. I'm sorry? The link that you provided in your brief to the amended protocol simply didn't work for us, and maybe that was our fault. But the appellants have filed an objection to the amended protocol that you filed on November 23rd, pointing out that several unapproved changes have been made to the protocol. Is that correct? That's correct. They did file that. Those changes, you characterize them as unapproved. They were approved by the department director, which is the protocol or the way amendments are to be drafted in the protocol. Those changes, however, do not go to the core constitutional issue in this matter. I don't think they do, but here's the problem. We'd like to be dealing with the actual protocol as amended that was really at that time in front of the district court. So what you gave us is something, may or may not have issues, and if they did have further issues, they could bring those up later, presumably. But we don't even have the right protocol. Right. The protocol that was provided was the protocol that was placed on the department's website on September 15th, 2009, which was essentially a month and a half to two months after the district court's decision on July 1, 2009. That protocol had certain changes. But we don't want that protocol. You don't want that protocol. I'll just tell you right now, that protocol wasn't in front of the district court, and so it's not going to be in front of this court. So what we would like, what I thought we asked for in clear terms, is we'd like the amended protocol as, you know, before the district court. What I can do is go back and send that back in based on the July, as of July, well, it'd be after July 1, 2009, because I think those changes went into effect per the department following the district court's decision. And I could, I mean, those changes are somewhat minor in a way. Well, the seven-man team versus the five-man team. Right. It went from seven to five, probably because of the non-use of the false line. But anyway. Somebody's going to say, I don't think the court needs to be in the business of trying to figure out what the record is, that if you would just please file the appropriate protocol, and Mr. Dickens has an objection to that, maybe to save the court is, you know, in the next ten days have that filed, run it by the Dickens Council. If you can't come to some agreement as to what the protocol was, then you can file what you think it is, and Dickens Council can object. Very well. I will do that as soon as I get back. That'd be helpful. Thank you. Sure. Other than those minor changes, if you look at the protocol that the district court looked at and what the changes the department made with respect to the protocol that was in place prior to the litigation, the protocol now, at least those safeguards that were promulgated by the department as a part of this litigation, clearly ensure that an inmate is properly anesthetized prior to the giving of pancarrhonium bromide and sodium thiopentol. I thought really the focus of counsel's argument seemed to be that there would be, you know, now you have the protocol, but there's factual issues as to whether you can retain an appropriate team and factual issues whether you actually would follow that protocol. Well, I believe the district court indicated that those weren't factual disputes. What the protocol ensures is that a medical team or a special operations team is going to be in place, and they've provided certain qualifications in the protocol to make sure that those individuals are properly qualified to perform their duties. With respect to the medical team, which is, I think, more important, because those are the individuals that are going to be ensuring that the IV line is patent and the chemicals will be provided to the inmate and will check for unconsciousness, both through visual and by physically going into the room. Those individuals now under this protocol, it wasn't the – when Robert Comer was executed in 2007, these particular qualifications were not written in a protocol. Now they are. And the director, the department director, now has to find individuals who are properly qualified. They will go through a criminal background check. They will go through a professional license check. Does that mean that people currently on staff will be reviewed, and will the current personnel who don't meet these will be fired? That's correct. They will not be chosen for any particular team. For example, the medical team, if the medical team includes a nurse or a doctor, those individuals prior to an execution will go through a criminal background check and a professional license check. They will also annually go through the professional license check and criminal background check. And again, if another execution warrant is issued by the Arizona Supreme Court, the department goes through another criminal background check and professional license check. With respect to the problems that plaintiffs have brought out with respect to Comer and after Comer, Dr. Deerhoff and medical team member number three, medical team member number three was never involved in an execution in Arizona. He was only retained on contract to provide training. So he was never involved in any execution. Dr. Deerhoff, on the other hand, was involved in the Comer execution. And then director, Arizona Department Director Dora Schreiro had experience working with Dr. Deerhoff. She was the department director in Missouri and had worked with Dr. Deerhoff on 15 to 20 executions. And she also knew Dr. Deerhoff through his involvement in running the lethal injection protocol for the federal government. So that was how Dr. Deerhoff became involved. But there has been no evidence presented that Robert Comer suffered any pain or was at any severe risk of pain during his execution. Nevertheless, with the current qualifications written into the protocol, it is likely that the department would not have Dr. Deerhoff back and has said that they will not have Dr. Deerhoff involved in any execution. He would not meet the qualifications. That's correct. He would not, based on his professional license check. So on the medical team, the amended protocol lays out some very specific requirements that were not there previously, correct? That's correct. But one of the other concerns I heard articulated is that, well, now you have the protocol, but there's really no assurance that it would be properly followed and that that raises a factual issue. Could you comment on that? I believe that's a completely speculative argument, and that's the same argument that's been that was made in Jackson v. Danburg in the Third Circuit. It's the same argument that was made in Nooner, which is an Eighth Circuit case. To say that the department won't follow its current written protocol is purely speculative, and the district court found that. The Arizona Department of Corrections has every incentive to follow this protocol and has stated it will do so. In their preamble to Department Order 710, it indicates that they have to follow the law. I mean, that's one of the things they have to follow. We all know, based on Bayes, what the law is, what the Eighth Amendment requirements are, and written into this protocol are those requirements. So the department has every incentive to follow this particular protocol and will do so. Well, the consequences, of course, are dire if they do not, and post hoc saying they put a third person are not very helpful to the victim in this case. That's correct. And the district court actually pointed that out with respect to the amendment procedure argument that the plaintiffs made below. The district court indicated that, you know, we now have a constitutional protocol. We have built-in safeguards in this protocol. And the department would – is now on notice that if they change or amend any of these particular safeguards, then they are opening themselves up to further litigation and a grant of summary judgment probably would not happen. So the department is very – they understand that these – this protocol that is now – has been found constitutional and provides safeguards to ensure that the lethal injection procedure is humane and safe is not going to amend those particular – the amendments that were made or the safeguards that are in place. With respect to the one drug protocol, it is – I mean, I think everyone knows that Ohio and Washington have gone to a one drug protocol and that it is a readily available alternative, but there's no showing here and there's no showing below that this particular protocol now has any substantial risk of harm to an inmate. In fact, I think it's quite the opposite, and the district court found so, that this protocol is substantially similar to the Kentucky protocol that was found constitutional and, in fact, has more safeguards in its protocol than does Kentucky's. If the court doesn't have any further questions. I had just one question having to do with the protocol that was in effect at the time of Mr. Comer's execution. We have a protocol dated May 1, 2007. Was that the procedures that were used at that time? I believe it was. As the district court laid out in its opinion, the history of how this has gone on since 1992 in Arizona, prior to Mr. Comer's execution, there really was no attachment F, which is what we're calling the protocol. Attachment F is the preparation and administration of chemicals. And that particular attachment was drafted prior to Mr. Comer's protocol, or his execution. And it included a central line in the femoral vein as the excess. I don't know if that was the one we would look to. I believe that is the one to look to. The one that is after the execution, I believe it's November of 2007. Those were further amendments that were made after the Comer execution and prior to this litigation. Thank you. Thank you. Your Honors, this case is not about paper. It's about performance. As the defendant stated, the medical and background checks now ensure that these people cannot be retained. But in discovery, the director of the Department of Corrections said that these background checks and license checks were occurring, and they still retained these people. There are material questions of fact as to whether this record of maladministration that has been uncovered during discovery gives rise to a substantial risk or an unnecessary risk of unconstitutional harm. Here, by simply comparing defendant's revised written protocol with the Kentucky protocol, the district court overlooked these genuine issues of fact. This court should reverse the district court's decision and remand for a trial. Thank you. I'd like to thank both of you for your argument this morning. We appreciate that. I also appreciate the briefing. We look forward to receiving the actual protocol. And with that, the case of Dickens v. Brewer is submitted and will adjourn for the morning.
judges: Hug, Nelson D. W., McKeown